UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BIG CITY DYNASTY CORP. and RYAN RADDON,<br><br>Plaintiffs,<br><br>v.<br><br>FP HOLDINGS, L.P.,<br><br>Defendant. | Case No.: 2:19-cv-02078-APG-NJK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Based on the bench trial I conducted and the parties' post-trial briefs, I make the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**A.     Summary of Action**

Plaintiff Ryan Raddon is a California resident and a well-known DJ who performs under the stage name "Kaskade."  Raddon is also the president and principal of plaintiff Big City Dynasty Corp., which is the entity through which he conducts his business.

Defendant FP Holdings, L.P. is a Nevada limited partnership and an indirect subsidiary of Station Casinos LLC, a Nevada limited liability company.  Station Casinos LLC is managed and controlled by Red Rock Resorts, Inc., a publicly-traded corporation formed under the laws of Delaware with its principal place of business in Clark County, Nevada.  During the relevant period, FP was the ultimate owner of the Palms Casino Resort, where it operated the KAOS nightclub and dayclub.

The plaintiffs sued FP for breaching an Artist Performance Agreement (the APA) that FP and Big City had entered into regarding shows Raddon was to perform at KAOS in 2019 and

2020. The plaintiffs seek damages totaling $7,950,000. FP initially denied it breached the APA and asserted various affirmative defenses, including impossibility, impracticability, and failure to mitigate damages.

The scope of the plaintiffs' claim and the relevant facts were narrowed through my rulings on the parties' motions for summary judgment. ECF No. 62. FP now acknowledges it breached the APA and concedes the plaintiffs are entitled to $1.2 million in damages for seven shows Raddon was unable to perform in 2019. FP denies it caused the remaining damages plaintiffs seek because—regardless of any breach by FP—the Covid-19 pandemic and resulting government shutdown orders rendered it impossible for the plaintiffs and FP to perform their obligations under the APA from March 15, 2020 through the end of the APA's term. For the period between January 1, 2020 and March 15, 2020—during which Raddon could have performed prior to the Covid-19 pandemic and shutdown—FP contends it has already compensated Raddon for any shows he would have performed, by virtue of an advance deposit it paid.

**B.   Background Facts**

FP and Big City entered into the APA effective January 8, 2018, although it was not fully executed by the parties until mid-February 2018. Exh. 1.[1] Big City, as producer, agreed to provide Raddon's DJ services to FP for 30 shows during 2019 and 30 shows during 2020. *Id.* §§ 1-2. Performances were to be scheduled by mutual agreement. *Id.* § 2(b).

All performances were to occur "at the new nightclub (the 'Nightclub') and dayclub (the 'Dayclub') (collectively the 'Venues') located at the Palms Resort Casino in Las Vegas, NV[]." *Id.* § 1. The Venue, which was under construction at the time the APA was signed, was

---

[1] Citations to "Exh." refer to the trial exhibits.

ultimately named KAOS. Because KAOS did not open until April 2019, the parties had to schedule 30 shows in less than nine months in 2019, which necessitated some back-to-back dates.

The plainitffs were entitled to $300,000 for each performance.[2] *Id*. § 2(c). FP was to pay the compensation in phases. For 2019, FP had to pay $2,250,000 within 10 days of executing the Agreement, $2,250,000 within five business days of January 1, 2019, and $150,000 within five business days of each completed performance. For 2020, FP had to pay $2,250,000 within five business days of September 30, 2019, $2,250,000 within five business days of January 1, 2020, and $150,000 within five business days of each completed 2020 performance.

KAOS opened in early April 2019, and Raddon completed 20 performances there from April 2019 through August 2019. FP paid $4,500,000 for the two 2019 advance fees, $3,000,000 for 20 completed performances, and $600,000 for four perfomances scheduled in September and October 2019 that were canceled due to construction at KAOS (decribed further below). FP did not pay for seven canceled performances scheduled in November and December 2019.[3] FP now acknowledges it owes plaintiffs $1,200,000 for those seven performances.

FP paid the first 2020 advance payment of $2,250,000. But it did not pay the next $2,250,000 advance in January 2020, nor did it pay $150,000 for any of the 30 performances that were to occur in 2020.

KAOS's financial performance struggled from the beginning. Around August 2019, FP's management decided to build a dome over the pool area of the dayclub, hoping that would increase revenue. The construction required the temporary closure of KAOS, so FP canceled

---

[2] The APA also provided for bonuses, but those are not at issue.

[3] The seven canceled performances include a 31st performance that the parties agreed to before FP anticipatorily breached, for which FP owed $300,000. *See* ECF Nos. 50-1 at 3; 46-7.

3

Raddon's (and all other artists') performances during that period.  FP asked Raddon and other artists to consider restructuring their agreements.  Raddon declined, and his lawyers sent FP a letter on August 30, 2019 claiming FP had anticipatorily breached the Agreement. Exh. 18.

FP denied plaintiffs' breach allegations. Exh. 19.  It did, however, notify the plaintiffs that it would have to cancel Raddon's four performances scheduled in September and October 2019 due to the dome construction.  FP paid the $150,000 balance for each of these canceled shows.

KAOS briefly reopened for Halloween weekend 2019, but on November 5, 2019, FP publicly announced that KAOS would be closed immediately as it was not economically viable. FP never offered the plaintiffs alternative venues or dates for Raddon's remaining performances in 2019 or 2020.

On November 13, 2019, the plaintiffs' counsel sent FP their third notice-of-breach letter based on FP's failure to pay for the canceled November 8, 2019 performance and the closure of KAOS. Exh. 15.  On December 3, 2019, the plaintiffs served notice they were terminating the APA. Exh. 16.

In March 2020, Nevada Governor Steve Sisolak ordered all non-essential businesses, including gaming establishments and nightclubs, to close to the public due to the Covid-19 pandemic. Exhs. 3, 4, 5.  The Palms closed on March 17, 2020.  In late May and early June 2020, gaming establishments and some businesses were permitted to reopen, and live entertainment was allowed to resume, albeit under significant restrictions. Exh. 8.  Live performances with public attendance were allowed to resume on October 1, 2020, subject to social-distancing and capacity restrictions. Exh. 10.  But the order closing nightclubs was not

lifted during 2020. FP never reopened the Palms, never reopened KAOS, and never offered the plaintiffs an alternative venue in which to perform.

On December 4, 2019, the plaintiffs filed this lawsuit, alleging one cause of action for breach of contract. The plaintiffs contend FP owes them $7.95 million: $1.2 million for the seven remaining shows in 2019 and $6.75 million for 30 shows in 2020.

## CONCLUSIONS OF LAW

### A. FP Breached the APA.

The APA is governed by Nevada law. Exh. 1 § 27. The elements of a breach of contract claim are: (1) a valid contract, (2) the plaintiff performed or was excused from performance, (3) the defendant failed to perform, and (4) the plaintiff suffered economic damage as a result of the defendant's breach. *Story-McPherson v. Bank of Am., N.A.*, No. 2:11-cv-01470-KJD-RJJ, 2012 WL 2000693, at *4 (D. Nev. June 5, 2012) (citing *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987)).

The parties agree that the plaintiffs have satisfied the first three elements of their breach claim. That is, the APA is a valid contract, the plaintiffs performed under the APA until they terminated it, and FP anticipatorily breached the APA by closing KAOS in November 2019 (thus failing to provide a suitable venue for Raddon's performances) and by not timely paying for the seven canceled 2019 performances. The parties dispute only the proper measure of the plaintiffs' damages.

### B. Post-Breach Events do not Excuse FP's Breach.

"[C]ausation is an essential element of a claim for breach of contract." *Clark Cnty. Sch. Dist. v. Richardson Constr., Inc.*, 168 P.3d 87, 96 (Nev. 2007). Thus, if the damages the

5

plaintiff seeks would have occurred regardless of the defendant's breach, the breach cannot give rise to damages. *Id.*

"The object of compensatory damages" for breach of contract "is merely to place the injured party in the position that he would have been in had the contract not been breached." *Dalton Props., Inc. v. Jones*, 683 P.2d 30, 31 (Nev. 1984). "It is black letter contract law that an 'injured party is limited to damages based on his actual loss caused by the breach.'" *Nalder ex rel. Nalder v. United Auto Ins. Co.*, No. 70504, 449 P.3d 1268, 2019 WL 5260073, at *2 (Nev. 2019) (quoting Restatement (Second) of Contracts § 347 cmt. e (1981)). So "[i]f, after the breach, an event occurs that would have discharged the party in breach on grounds of impracticability of performance or frustration of purpose, damages are limited to the loss sustained prior to that event." Restatement (Second) of Contracts § 347 cmt. e.

FP relies on this theory to argue that, regardless of its breach of the APA, the Covid-19 pandemic and resulting shutdown made it impossible (or at least materially more burdensome) for any concerts to be performed in 2020. Thus, FP argues, the plaintiffs suffered no actual damages in 2020 because KAOS would have been closed anyhow.

However, this limitation on damages to actual losses does not apply where the parties have contractually agreed to a specific remedy. Restatement (Second) of Contracts § 347 cmt. a (1981) (the damages limitation "is subject to the agreement of the parties, as where they provide for liquidated damages"). "Liquidated damages are the sum which a party to a contract agrees to pay if he fails to perform, and which, having been arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach, is recoverable as agreed-upon damages should a breach occur." *Mason v. Fakhimi*, 865 P.2d 333, 335 (Nev. 1993). *See also* Restatement (Second) of Contracts § 356(1) ("Damages for breach by either party may be

liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss.").

In Nevada, liquidated damages provisions are presumed valid. "[T]he party challenging the provision must establish that the provision amounts to a penalty" by showing "that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Mason*, 865 P.2d at 335. "The calculation of actual damages occurs at the time of the breach, not at the time of contract formation." *Sorenson v. Radel-Sorenson*, No. 70756, 2018 WL 3913252, at *3 (Nev. Ct. App. Jul. 27, 2018) (unpublished). This makes sense, as in most cases actual damages likely would not be known at the time the contract is formed.

Here, the APA provides that in the event of a material uncured breach, "the non-breaching party shall have the right (in such party's sole discretion), without prejudice to any other rights and remedies to immediately terminate" the APA. Ex. 1 § 20. It also provides a remedy:

> In the event of a material uncured breach by [FP], [Big City] shall have the right to: (i) retain all amounts already paid to [Big City] by [FP] as partial compensation for such breach; (ii) receive the unpaid balance of the compensation stated in Section 2; and (iii) [the plaintiffs] shall have no further liabilities and/or obligations in connection with the Engagement or the transactions contemplated by this Agreement.

*Id*. This is properly read as a liquidated damages provision that allows the plaintiffs to recover all of the compensation owed under the APA (i.e., $7,950,000). FP responds that this is an unenforceable penalty because the plaintiffs suffered no actual damages, due to the pandemic and resulting shutdown. I disagree. The damages recoverable under § 20 are not disproportionate to the plaintiffs' actual damages. FP concedes it owes $1.2 million for the canceled 2019 shows. Raddon could have performed several shows between

7

January 1 and March 15, 2020, before the shutdown order. And once casinos and businesses were able to reopen in June 2020 (and public concerts in October), additional performances could have been scheduled, albeit in a different format or venue. FP could have avoided breaching the APA by providing a "suitable venue" for Raddon to perform. Exh. 1 § 20. Yet FP never offered or even considered another venue, even though, for example, its Pearl Theater was available. And Raddon was willing to consider alternative venues, even outdoor or streaming performances. It was not impossible for the plaintiffs to schedule 30 performances in 2020.

FP argues that any performances under pandemic restrictions would have been materially more burdensome and FP would have lost significant amounts of money. This argument is unavailing for several reasons. First, FP never analyzed the feasibility of an alternative venue or other arrangement to avoid a breach and allow the plaintiffs to perform their obligations under the APA. *See* Exh. 1 at 10 § 20; ECF No. 98 at 136-37; *Id.* at 246-47. Streaming or drive-in performances were not part of FP's business model. ECF No. 98 at 134. But that does not excuse FP from performing its obligations. The plaintiffs were ready, willing, and able to perform on alternative dates (Exh. 15) and in alternative locations, but FP offered none and did not even consider any.

Even if FP correctly assumed that such alternative arrangements would have been more expensive and less profitable, that does not excuse its breach. "[I]n order for an unforeseen cost increase to excuse performance, the increase must be more than merely onerous or expensive, it must be positively unjust to hold the parties bound." *Helms Const. & Dev. Co. v. State ex rel. Dept. of Highways*, 634 P.2d 1224, 1225 (Nev. 1981) (simplified).[4] FP lost money on many of

---

[4] *See also Hellerstein v. Desert Lifestyles, LLC*, No. 15-cv-01804-RFB-CWH, 2015 WL 6962862, at *9 (D. Nev. Nov. 10, 2015) ("[A] struggling economy alone cannot serve as the basis for this defense. If that were the case, any promisor who was losing money under a

Raddon's pre-pandemic performances. It contends that those losses would have been even larger going forward for performances with even smaller audiences due to pandemic-related restrictions. But FP assumed the risk of small audiences and large losses when it entered into the APA. The APA did not condition the plaintiffs' compensation on a certain number of patrons for Raddon's performances. Pre-pandemic, if the audience was small and FP lost a huge amount of money, the plaintiffs were still entitled to full payment. Indeed, FP lost money on many of Raddon's shows but it still paid the plaintiffs.

This interpretation of the APA is consistent with the parties' intent. *Nev. State Educ. Assoc. v. Clark Cnty. Educ. Assoc.*, 482 P.3d 665, 673 (Nev. 2021) ("The goal of contract interpretation is to discern the intent of the parties.") (simplified). During negotiations over the APA, the plaintiffs' lawyer wrote to FP's counsel about the breach provision:

> If [FP] breaches, we need to be entitled to the full fees due under the agreement, including the unpaid balance of outstanding fees. Either your client is providing a guarantee of $9M per year or they're not. If they breach and it remains uncured, then [Raddon] should be entitled to his bargained-for fees without having to take his chances in a court of law and wait potentially years of litigation to obtain a judgment. Not providing this (which is standard in all other Vegas residency deals) could create an incentive for your client not to move forward with the deal.

Exh. 43 at 2. FP's counsel responded: "Please see updated language in the attached" new draft of the contract. *Id.* That new draft included the current version of § 20. Exhs. 44, 45. It is apparent that FP agreed to guarantee the $9 million compensation under the APA.

FP argues this evidence and related testimony are barred by the parol evidence rule. The plaintiffs respond that I can consider it as a custom or usage of the trade, but I disagree. The plaintiffs' lawyer, Edward Shapiro, testified that an arrangement like this is "the custom and

---

contract would be able to avoid her obligations under that contract simply by pointing to indicators of poor economic performance—clearly an untenable result.").

9

practice of the industry for an artist at Mr. Raddon's level . . . ." ECF No. 96 at 183-184 (11/29/21 Trans.). *See also Id.* at 166 ("[F]or someone of Mr. Raddon's stature . . . many artists of that level will have – it's normal for artists of that level to have guarantees."). But that is an admittedly narrow scope for an industry or trade. *Id.* at 169 ("[T]here are only, probably, less than a handful of -- of artists that are DJs in the space that occupy the space that Mr. Raddon does. He's not the only one, but there are a handful. And for those particular artists, this is standard."). "Less than a handful" is not sufficient to show a custom or trade usage, even in the DJ industry. *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 368 (Nev. 2013) ("'A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement.'") (quoting Restatement (Second) of Contracts § 222(1) (1981)).

Although I do not find this evidence to show a custom or trade usage, it is not barred by the parol evidence rule. That rule "does not bar extrinsic evidence that is offered to explain matters on which the contract is silent so long as the evidence does not contradict the agreement's terms." *In re Cay Clubs*, 340 P.3d 563, 574 (Nev. 2014) (simplified). The parties disagree about whether § 20 is a guarantee of the plaintiffs' compensation in the event of breach. Neither the parties nor I believe § 20 is ambiguous, although the parties disagree as to what it means. ECF No. 96 at 142-43. The word "guarantee" is not included in § 20, but its language supports that it is a guarantee. To the extent § 20 is silent on this issue, then the emails and testimony of counsel negotiating it are acceptable parol evidence on whether compensation was

guaranteed and when the payments are owed after a breach. And this evidence does not contradict anything in the APA.[5]

Finally, the liquidated damages under § 20 are not disproportionate because the plaintiffs suffered actual losses beyond the canceled shows. They lost the chance to earn success bonuses under the APA; they lost the chance to sell merchandise; they lost the chance to expose Raddon's music to new fans; they lost the opportunity to stay relevant to Raddon's audience by performing new material; and canceled shows could damage Raddon's reputation. These damages are difficult to quantify, but they are real nonetheless.[6]

Given these losses, plus the losses from canceled performances in 2019 and 2020, the liquidated damages amount in § 20 is not disproportionate to the plaintiffs' actual losses. It is not "positively unjust" to hold FP bound to the APA despite increased expenses and losses because FP undertook the risk of financial losses when it entered into the APA. *Helms*, 634 P.2d at 1225. Section 20 is an enforceable liquidated damages clause, not a penalty.

---

[5] The APA's *force majeure* provision also supports this interpretation in that the plaintiffs would be entitled to compensation even if a performance was canceled at the last minute. The parties agreed that in the event a *force majeure* prevents a performance, the parties shall "attempt in good faith to re-schedule the [p]erformance in question to a comparable date." Exh. 1 § 19. If the performance cannot be rescheduled prior to the performance date and Raddon "is ready, willing, present in Las Vegas and able to perform, [Big City] shall be entitled to 50% of the compensation due for the applicable [p]erformance." *Id.* Thus, the parties clearly contemplated that even if cancelation was due to a *force majeure*, the plaintiffs would be guaranteed 50% of the compensation under conditions that were not difficult to fulfill.

[6] The *force majeure* provision is another potential source of loss. As discussed above, under that provision, the plaintiffs would be entitled to 50% of the compensation under certain circumstances. FP never offered any dates for 2020 performances so it is unclear whether Raddon would have been present in Las Vegas on those dates. Nevertheless, the parties clearly contemplated that the plaintiffs would be entitled to some compensation even for canceled shows.

FP admits that the plaintiffs are entitled to $1,200,000 for the seven canceled 2019 performances.  As for 2020, the plaintiffs are entitled to recover $6,750,000 for 30 performances that would have been performed but for FP's breach of the APA.  Thus, I award the plaintiffs $7,950,000 in damages.

**C.     The Plaintiffs are Entitled to Recover Their Attorney's Fees and Costs.**

The APA provides that, "[i]n any litigation relating to this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and costs." Exh. 1 § 27.  Because the plaintiffs are the prevailing parties and were forced to bring this action due to FP's refusal to pay even undisputed amounts,[7] they are entitled to recover their fees and costs incurred in connection with this matter.  The plaintiffs may file a motion for fees and recoverable costs.  But first they must discuss those fees and costs with FP to try to reach an agreement on them.

## CONCLUSION

I THEREFORE ORDER that judgment should be entered in favor of plaintiffs Ryan Raddon and Big City Dynasty Corp. and against defendant FP Holdings, L.P. in the amount of $7,950,000.  The clerk of the court will enter judgment accordingly.

I FURTHER ORDER that if the plaintiffs intend to seek an award of their attorney's fees and costs, they will provide to FP a calculation of those fees and costs, along with supporting documentation, by April 8, 2022.  If the parties are unable to agree upon an amount within 30

---

[7] Even if the damages were limited to the $1.2 million that FP admits it owes, the plaintiffs would be the prevailing parties (and thus entitled to recover their fees and costs) because they were required to file this suit to recover even that amount.

days of the plaintiffs providing the information to FP, then the plaintiffs may file a motion to recover them.[8]

DATED THIS 18th day of March, 2022.

                                            Andrew P. Gordon
                                            UNITED STATES DISTRICT JUDGE

---

[8] I remind the plaintiffs they must comply with Fed. R. Civ. P. 54 and Local Rules 54-1 through 54-14, which include information about differences between (and different methods for recovering) taxable and non-taxable costs.